J-A28034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KHALIL HARRIS | : | |
| | : | |
| Appellant | : | No. 634 EDA 2023 |

Appeal from the Judgment of Sentence Entered February 3, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003233-2019

BEFORE: OLSON, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 20, 2024**

Appellant, Khalil Harris, appeals from the judgment of sentence following the jury convictions of aggravated assault by causing or attempting to cause serious bodily injury, aggravated assault by causing bodily injury with a deadly weapon, criminal conspiracy to commit aggravated assault (attempting to cause or causing serious bodily injury), criminal conspiracy to commit aggravated assault (causing bodily injury with a deadly weapon), criminal conspiracy to commit robbery with a threat of immediate serious bodily injury, criminal conspiracy to commit robbery by inflicting serious bodily injury, and criminal conspiracy to commit burglary.[1] Before us are four claims

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a)(1), 2702(a)(4), 903 and 2702(a)(1), 903 and 2702(a)(4), 903 and 3701(a)(1)(ii), 903 and 3701(a)(1)(i), and 903 and 3502(a)(1), respectively.

that the suppression court erred and two claims that the sentence imposed was illegal. After careful consideration, we affirm.

Jonathan Peters and Amanda Healy were married and lived in Apartment E-10 at the Willow Apartments, a multi-building complex in Clifton Heights. Mr. Peters was a known marijuana dealer in the apartment complex. There was a knock on the door of the apartment after midnight on August 24, 2018, which Mr. Peters at first ignored, but answered when the knocking persisted. He opened the door slightly and an unidentified man asked to purchase marijuana. When Mr. Peters refused, Appellant and co-defendant Maxamillian Johnson stepped into view behind the unidentified buyer. Appellant was holding a revolver and co-defendant had a long gun, which he used to prevent Mr. Peters from closing the door. A struggle ensued over the wedged open door, during which Appellant struck Mr. Peters in the head with the handgun and then shot him in the shoulder. So wounded, Mr. Peters could no longer defend the door. While Appellant stood watch in the doorway of the lit apartment, co-defendant went through the living area and kitchen from which he took a handgun and two jars of marijuana.

A neighbor across the hall from Mr. Peters' apartment reported the incident to police twice. The first time the neighbor reported an attempted robbery by two black men, one of whom was described as bald, wearing a black t-shirt, and holding a long gun. The second time the crime was reported as a shooting.

The following is a summary of the trial court's factual findings from its March 11, 2020 Suppression Court Findings of Fact and Conclusions of Law (attached as Appendix A to the Trial Court Opinion), denying Appellant's suppression motion:

At the suppression hearing the Commonwealth presented the testimony of Sergeant Thomas Wooding; Officer Timothy Ervin, and Officer Craig White. The parties stipulated that this Court could review the preliminary hearing testimony of the victim, Jonathan Peters.

On August 24, 2018, Sergeant Wooding of the Clifton Heights Police Department was on patrol in full uniform and a marked patrol car. Officer Michael Hahn was his patrol partner in a different marked car. Sergeant Wooding received a call to the Willow Apartments on Springfield Road in Clifton Heights for a robbery in progress. Several police officers responded immediately and arrived at the apartment complex within a minute of the dispatch time. N.T. 1/8/2020, 11-12.

As Sergeant Wooding drove into the complex, he received an updated dispatch that the incident was upgraded to a shooting and happened inside Building E. The actors were described as two black men, one holding a long gun and the other was bald and was wearing a black t-shirt. N.T. 1/8/20, 12.[2]

Sergeant Wooding saw a black man in tan pants approximately 50-100 yards away. The man was running from the area behind Building E and was between Buildings F and H. The Sergeant identified himself as a police officer and called to him several times to stop running. The man in tan pants made direct eye contact with the Sergeant, "ignored the commands," and kept running

_____

[2] The finding that one of the men was holding a long gun and the other was bald in a black t-shirt is inaccurate. Sergeant Wooding's testimony was that police radio provided "a description of two black male actors, one possibly havinq a long gun, wearing a black t-shirt and having a bald head." N.T. Suppression, 1/8/20, 12. There was no additional description of the other black man provided to the responding officers, though in fact radio dispatch had been informed that the other man was last seen wearing "possibly orange pants." *Id*., 36-37.

- 3 -

through the parking lot of the complex towards Springfield Road. Sergeant Wooding saw Officer Ervin of the Darby Township Police Department pull into the parking area from Springfield Road, and radioed the officer to pursue the man just as he ran past Officer Ervin's patrol car. Officer Ervin put his car into reverse and pursued. N.T. 1/8/20, 13-19.

Sergeant Wooding went to the area between Buildings E and F where he had first seen the man in the tan pants running. There, the Sergeant saw a second man, bald and wearing a black t-shirt. He ordered that man to stop and get on the ground. The bald man ignored the commands and ran towards the rear of Building E. Sergeant Wooding lost sight of him. N.T. 1/8/20, 19-21.

Sergeant Wooding then went inside Building E where he met Amanda Healey. She directed him to Apartment 10 on the third floor. There, the Sergeant met the victim. Mr. Peters showed the Sergeant the gunshot wound to his left shoulder. They told the Sergeant they were robbed by two black men. N.T. 1/8/20, 21.

When Officer White came to the apartment to give aid to the victim, Sergeant Wooding went outside to set up a perimeter. Officer Thayer McCaully of the Collingdale Police Department reported to the Sergeant that he found an AR-15 style rifle, a handgun, and two jars containing marijuana. He found the items between Building F and H, near to where the Sergeant had first seen the man in the tan pants running and then later saw the bald man in the black t-shirt. The rifle matched the description in the radio call, and the marijuana and handgun were items stolen from the victim. N.T. 1/8/20, 22-24.

Meanwhile, Officer Ervin pursued the man in the tan pants, who had turned right on Springfield Road and run into a wooded area that led to the SEPTA Regional Rail tracks. Officer Ervin climbed a fence to the train station where he anticipated the man would come out of the woods but did not see him there or on the tracks. The officer returned to the wooded hill area where he had last seen the man. There, Officer Ervin found the man attempting to hide beneath vegetation. He directed the man to show his hands. The man briefly complied, but, as soon as he stood up, then ran through the wooded area towards the apartment complex parking lot. N.T. 1/8/20, 18, 50-52.

Officer Ervin called for the man to stop running and pursued him. They both lost their footing and tumbled into the parking lot. Where the man in the tan pants, Appellant, was apprehended. By

- 4 -

this time, Mr. Peters had been walked from his apartment by Officer White to an ambulance in the parking lot where his wound was being treated. Officer White asked the officers to bring Appellant to the back of the ambulance. The back doors of the ambulance were open. When Appellant was brought to the rear of the ambulance, Mr. Peters was asked if Appellant had been one of the men in his apartment. Mr. Peters nodded his head in the affirmative. N.T. 1/8/20, 18, 52, 70-71.

Suppression Court Findings of Fact and Conclusions of Law, 1-4. The court found the three testifying police personnel to be wholly credible. Trial Court Opinion, 6.

Appellant was apprehended by officers after tumbling into the complex parking lot at 12:50 a.m., about four minutes after Sergeant Wooding had been the first officer to arrive at the complex. N.T. 1/8/20, 40, 44. At about 12:52 a.m., after Appellant was apprehended but before he was identified by Mr. Peters, an officer discovered an assault style rifle, handgun and two jars of marijuana in the bushes adjacent to where Sergeant Wooding had first seen Appellant and co-defendant. *Id.*, 22-23, 44. The assault style rifle matched the description of the long gun used by co-defendant, and it was later determined that the handgun and the two jars of marijuana had been taken from Mr. Peter's apartment during the robbery. *Id.*, 23-25. At about 1:02 a.m., Mr. Peters positively identified Appellant as one of the two gunmen who had entered his apartment. After the positive identification, officers conducted a search incident to arrest and recovered a cell phone from Appellant's pocket. At the scene that night, but after Appellant's arrest, the handgun he used in the robbery was discovered in the bushes near to where the assault rifle and

stolen items were found. Later, pursuant to a search warrant for the phone, investigators obtained call and location data and a photograph of co-defendant.

Co-defendant was not apprehended that night. However, that same night, Taleah Cooper, Mr. Peters' neighbor in Apartment E-9, drove a car registered to co-defendant into freshly poured cement. The car became stuck. When Darby Township police arrived to assist, Ms. Cooper gave them false identification for which she was subsequently arrested. Because Cooper was taken into custody and was not the registered owner, the car was towed to a police impoundment lot and an inventory search conducted. Police found a box of Remington .357 caliber ammunition in the car.

Appellant filed a motion to suppress: the cell phone found on him at the time of his arrest for lack of probable case; the identification by the victim as being too suggestive; and the information found on his cell phone due to a lack of probable cause on the four corners of the warrant. An evidentiary hearing was held on January 8, 2020. The court asked for briefs from the parties after argument and, on March 11th, issued its written Findings of Fact and Conclusions of Law denying suppression. Trial Court Opinion, 5-6.

Appellant and co-defendant were jointly tried in December 2022.[3] Appellant was found guilty of the above listed offenses by the jury on

_____

[3] They were to be tried together in December 2021, but co-defendant contracted COVID-19 immediately prior to trial. Appellant was tried alone in

*(Footnote Continued Next Page)*

December 15, 2022. The jury found him not guilty of robbery and burglary. On February 3, 2023, the court imposed an aggregate term of 153 to 306 months' incarceration. Appellant filed a reconsideration motion, which was denied after a hearing on March 2, 2023. Appellant timely filed a Notice of Appeal on March 3, 2023.

Appellant raised four claims in his Rule 1925(B) Statement that he also forwards in his brief:

1. The Court erred in its March 1, 2020 Order when [it]:

a. Denied defense counsel's Motion to Suppress Mr. Harris' arrest. The facts known to the police at the time of Mr. Harris' arrest were insufficient to support either reasonable suspicion or probable cause;

b. Denied defense counsel's Motion to Suppress the search of the iPhone taken from Mr. Harris during his arrest. The search warrant's affidavit lacked probable cause within its 'four corners' that evidence of a crime would be found in the iPhone under the totality of the circumstances. There was no nexus established between Mr. Harris' possession of the iPhone and the affidavit's conclusion that incriminating evidence would be found in it;

c. Denied defense counsel's Motion to Exclude Suggestive Identifications of the Defendant because: (1) the August 24, 2018 identification of Mr. Harris by Mr. Peters was sufficiently suggestive to give rise to the substantial likelihood of irreparable misidentification; (2) Mr. Peters' identification of Mr. Harris at the preliminary hearing was tainted by the first suggestive identification; and (3) the Commonwealth failed to establish an independent basis for Mr. Peters' identification of Mr. Harris.

_____

December 2021, resulting in a hung jury. They were then to be jointly tried in August 2022, but Appellant fired counsel during jury selection.

2. The Court erred during the January 8, 2020 suppression motion hearing by allowing the admission of the transcript from the preliminary hearing containing Mr. Peters' testimony. Defense counsel objected on both hearsay and constitutional grounds-the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

Appellant's Rule 1925(b) Statement. In addition, Appellant alleged in his Reply Brief that some of the individual sentences imposed were illegal on the grounds that he: (3) "should only be sentenced to one criminal conspiracy offense;" and (4) "should only be sentenced on one aggravated assault offense." Appellant's Reply Brief, 2, 4.

The suppression claims are governed by the following standard of review:

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by those findings and may reverse only if the [suppression] court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on the allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, 'whose duty it is to determine if the suppression court properly applied the law to the facts.' Thus, the conclusions of law of the [suppression court] are subject to our plenary review.

**Commonwealth v. Kemp**, 195 A.3d 269, 275 (Pa. Super. 2018) (**quoting Commonwealth v. Jones**, 988 A.2d 649, 654 (Pa. 2010)).

In his first suppression claim, Appellant argues that the police lacked probable cause or reasonable suspicion at the time of his arrest, and therefore

the search incident to that arrest was illegal and the cell phone found on him (and the information obtained from the phone) must be suppressed. Appellant specifically contends that Sergeant Wooding did not have reasonable suspicion "[a]t the moment [he] gave the order to apprehend" him, noting that his flight was not alone sufficient and the only other factors to support a stop or arrest were his "race, gender and the fact that he emerged from buildings that were not the location of the robbery." Appellant's Brief, 21-22. We are not persuaded by Appellant's argument.

As the trial court found, there was reasonable suspicion for Sergeant Wooding to believe that Appellant was one of the two men involved in a reported, and very recent, robbery and shooting. Trial Court Opinion, 10-11. The fundamental inquiry for determining whether reasonable suspicion existed is an objective one, namely, whether "the facts available to the officer at the moment of the [intrusion] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." **Terry v. Ohio**, 392 U.S. 1, 21-22 (1968) (internal citations omitted); **Commonwealth v. Moore**, 805 A.2d 616, 619 (Pa. Super. 2002).[4] An officer "is not required to simply shrug his

---

[4] In addition, "reasonable suspicion need not rule out the possibility of innocent conduct." **Navarette v. California**, 572 U.S. 393, 403 (2014); **Interest of T.W.**, 261 A.3d 409, 423 (Pa. 2021) ("we must afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience, and acknowledge that innocent facts, when considered collectively, may give the officer reasonable suspicion") (internal quotations, brackets and citation omitted).

shoulders and allow a criminal to escape." ***Commonwealth v. Douglass***, 701 A.2d 1376, 1380 (Pa. Super. 1997).

Appellant asks this court to divorce the known facts from their context and focus only on the paucity of descriptors for the gunman (who was not wearing a black t-shirt or carrying a rifle) and accept that "he emerged from buildings that were not the location of the robbery." Appellant's Brief, 22. To the contrary, an assessment of reasonable suspicion, "like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability." ***Moore***, 805 A.2d at 619 (quoting ***Commonwealth v. Shine***, 784 A.2d 167, 170 (Pa. Super. 2001) (citations omitted)).

The instant context includes the recency of the reported robbery and shooting, which lends great weight to the belief that the actors would be in the immediate area. It was after midnight, when it would be reasonable to assume there would be little foot traffic in the area. Furthermore, Appellant was first seen by Sergeant Wooding "fleeing" – *i.e.*, running – on a walkway between buildings F and H of a multi-building apartment complex. N.T. 1/8/20, 13-14. As the testimony and exhibits introduced at the suppression hearing demonstrated, buildings E, F, G, and H form a square with walkways that meet at a central intersection off of which ran the walkway on which Appellant was spotted. N.T. 1/8/20, 15-20; EX. CS-1; R.R. 133b. Though Appellant was between buildings F and H, he was essentially the same

distance from each of the quadrangle entrances of the four buildings on the common walkways.

Contrary to his argument, therefore, Appellant's location did not preclude the inference, supported by the timing and running, that he was one of the two robbers. This was enough to support Sergeant Wooding's decision to stop Appellant to question him. **See Douglass**, 701 A.2d at 1380 (requisite suspicion to detain suspect existed where "officer reasonably determined that a crime had been committed and the appellant committed it"). Immediately thereafter Sergeant Wooding saw the second man from the radio flash, dressed in black, in the same location, who also ran away. That the more completely described man from the flash was seen in the same location as Appellant lent further support for the pursuit of Appellant as the other man reported in the robbery.[5]

---

[5] Appellant did not claim, after he was apprehended by police officers while tumbling down the hill into the parking lot, that it was unlawful to transport him to the ambulance parked in the same apartment complex to be identified by the wounded victim unless there was full probable cause. This claim would have failed. "[T]here are certain exigencies—and particularly, the need for safety or security in conducting and completing an investigative detention—the existence of which would make it reasonable … to place a suspect in a vehicle and transport him a short distance during an investigative detention." **Commonwealth v. Revere**, 888 A.2d 694, 707 (Pa. 2005). Notably, the Supreme Court stated with approval that "it might be quite reasonable to transport a suspect to the crime scene for possible identification. If, for example, the victim of an assault or other serious offense was injured or otherwise physically unable to be taken promptly to view the suspect," and there was at least reasonable suspicion. **Id.** at 705.

Appellant's argument rests on the supposedly meager description of Appellant, essentially just his race and gender. However, the very close proximity of time and location to the reported robbery and his unprovoked running away from the site of the robbery outweigh the lack of a description of his clothing.[6] "[U]nprovoked flight, even when not in a high crime area, combined with [the defendant's] proximity to the location described in the flash, and [his] matching the description of the suspect, does give rise to reasonable suspicion that criminal activity was afoot." *Commonwealth v. Walls*, 53 A.3d 889, 894 (Pa. Super. 2012) (reversing order suppressing gun). In short, Appellant and his location, matched in every way the description of one of the gunmen in the reported robbery, and his flight lent weight to Sergeant Wooding's reasonable belief that action to detain him was appropriate. *See Commonwealth v. Bryant*, 866 A.2d 1143, 1147 (Pa. Super. 2005) (holding that an officer may direct a fleeing individual to stop for questioning if the officer reasonably deduces that the individual is potentially "a perpetrator, victim, or eyewitness of a possible shooting").

_____

[6] The instant case is distinguishable from *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996)*.* "In *Matos,* the police officers had only vague descriptions regarding the identity of the persons and location," whereas here it was a precise location and time. *Commonwealth v. Cook*, 735 A.2d 673, 678 (Pa. 1999). In addition, in both of "the companion cases of *Matos,* the police officers approached the appellants for no apparent reason. Accordingly, in all three factual scenarios involved in the *Matos* decision, the police had no reason, other than the appellants' flight, to suspect that criminal activity was afoot." *Id*.

Moreover, Appellant explicitly seeks to suppress the cell phone found on him during a search incident to an arrest. He claims, however, that the arrest occurred, and probable cause was required, when he was apprehended by officers after tumbling into the apartment complex parking lot, because "he had no ability to leave" while handcuffed and detained. Appellant's Brief, 23. Being unable to leave is not what separates an investigative detention requiring reasonable suspicion from a custodial detention requiring probable cause, but rather is what makes them similar. *See Michigan v. Long*, 463 U.S. 1032, 1051 (1984) ("[d]uring any investigative detention, the suspect is 'in the control' of the officers in the sense that he 'may be briefly detained against his will....'"); *Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2017) (the difference between a mere encounter and a seizure/investigative detention is "whether a citizen's movement has been restrained").

The distinction between an investigative and a custodial detention is whether "under the totality of circumstances the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest." *Commonwealth v. Ellis*, 549 A.2d 1323, 1332 (Pa. Super. 1988). "Among the factors which may be considered in determining whether a detention is custodial are: the basis for the detention (the crime suspected and the grounds for suspicion); the duration of the detention; the location of the detention (public or private); whether the suspect was transported against his will (how far, why); the method of the detention (restraints utilized); the

show, threat or use of force; and the investigative methods used to confirm or dispel suspicions." *Id*. Here, Appellant was detained in public, on suspicion of armed robbery, handcuffed while brought, consistent with *Revere*, to the injured victim to be identified and thereby either confirm or dispel suspicion in the most expedient fashion. We conclude this was an investigative detention.

Probable cause was only required at, and had been obtained by, the time Appellant was searched. The search occurred after Appellant was identified by Mr. Peters as one of the gunmen who entered his apartment. N.T. 1/8/20, 70-72. Mr. Peters had a visible gunshot wound and had told Sergeant Wooding directly that he had been robbed in his apartment by two men. *Id.*, 21. The victim's positive identification of Appellant as one of the two men who had robbed him, along with the physical evidence of a shooting and the discovery of a discarded rifle, was more than sufficient to support probable cause.[7] *Commonwealth v. Williams*, 464 A.2d 411, 417 (Pa. Super. 1983) ("an identification by either [the victim or a witness] would be sufficiently reliable to serve as the basis for a finding of probable cause"); *Commonwealth v. Wiggins*, 361 A.2d 750, 752 (Pa. Super. 1976) ("it is

_____

[7] Probable cause is determined by considering the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213 (1983). It exists when a police officer makes a practical common sense decision whether, given all of the circumstances known to him at that time, including hearsay information, there is a fair probability that a crime was committed and that the suspect committed the crime. *Commonwealth v. Williams*, 305 A.3d 89, 94 (Pa. Super. 2023); *Commonwealth v. Hannon*, 837 A.2d 551, 554 (Pa. Super. 2003).

established in this Commonwealth that tentative identifications are sufficient even to sustain a conviction … Certainly, no more is required for an arrest") (internal citation omitted). The search of Appellant, incident to an arrest based on probable cause is lawful. **Commonwealth v. Stallworth**, 781 A.2d 110, 116–17 (Pa. 2001) (holding that a warrantless search incident to a lawful arrest is proper). "Since probable cause existed to arrest appellant, and appellant's person was searched incident to a legal arrest, the evidence obtained from a search of appellant's pockets was properly admitted." **Commonwealth v. Hannon**, 837 A.2d 551, 555 (Pa. Super. 2003).

In his second suppression claim, Appellant asserts there was no nexus established between his cell phone and information that could identify the unknown conspirator necessary to support the issuance of a search warrant for the contents of the cell phone. Appellant's Brief, 25. Appellant's is a challenge to the four-corners of the warrant, requiring that information amounting to probable cause to support the search be recited within the warrant itself. **Commonwealth v. Smith**, 784 A.2d 182, 184 (Pa. Super. 2001). In issuing a search warrant:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing] that probable cause existed.'

*Commonwealth v. Gray*, 503 A.2d 921, 925 (Pa. 1985); *see also Commonwealth v. Johnson*, 240 A.3d 575, 585 (Pa. 2020) (Opinion Announcing Judgment of the Court); *Commonwealth v. Manuel*, 194 A.3d 1076, 1081 (Pa. Super. 2018) (*en banc*). "[E]ven doubtful or marginal cases" should be determined "by the preference to be accorded to warrants" in order to encourage use of the warrant process. *Illinois v. Gates*, 462 U.S. 213, 236 n.10 (1986). A request to search a cell phone must provide a link between the cell phone and the crimes listed in the warrant. *Johnson*, 240 A.3d at 577-78.

Here, the suppression court ruled upon a "[c]areful examination of the information listed within the four corners of the warrant [that it] provided the magisterial district judge with a substantial basis for concluding that probable cause existed." Trial Court Opinion, 11. "[T]he affidavit of probable cause specifically recited Sergeant Wooding's observations of the incident," *id*., which established that at least two men were involved in the robbery/shooting, one of whom evaded apprehension. In addition, the affidavit was written by a 40-year police veteran experienced in investigating assault and weapons offenses, and forwarded his knowledge that: (1) "In many if not all incidents of this nature the persons involved as offenders are in possession of cell phones;" (2) "Information obtained by search warrants assist in investigation in identifying unknown co-conspirators;" (3) when the affiant stood in the doorway of the victim's apartment he could see a bullet hole in the wall behind the door and blood on the carpet and smell burnt

marijuana; and (4) in addition to the rifle, hand gun and two plastic containers of marijuana found in the area from which the two suspects were first seen running, a revolver was discovered under a bush Appellant had run past. Affidavit of Probable Cause, p.2 of 5; R.R. 25a.

We affirm the suppression court's ruling. There was a substantial basis for the magistrate to conclude there was a "fair probability" that information identifying the co-conspirator would be found on Appellant's phone. The affidavit plainly sets out that the armed robbery was committed by two men, both of whom were seen fleeing from the area of abandoned items in the near aftermath of the robbery and shooting. One was apprehended and the other eluded capture. Officers recovered a cell phone from the person that was apprehended. An officer experienced in such investigations stated that information available on a conspirator's cellphone would assist in identifying the unknown conspirator. The phone was in fact found on Appellant, and so puts to rest his complaint that cell phones could be found on most anyone. **See** Appellant's Brief, 27. This warrant was to search a known phone found on Appellant, and not to search for a phone that could have been used by Appellant. That the experienced officer believed information on the phone found on Appellant could identify the unknown conspirator provided a nexus between this crime and Appellant's cell phone. **See Commonwealth v. Freeman**, 128 A.3d 1231, 1243 (Pa. Super. 2015) (trial court properly denied suppression of data stored on his cell phones, where affidavit of probable cause "provided the issuing magistrate with a substantial basis to conclude

- 17 -

that there was a fair probability that evidence of criminal activity would be found on [accused's] cell phones").

We draw instruction from the decision by the Supreme Court of Pennsylvania in **Johnson**.[8] The search warrant in **Johnson** lacked probable cause in ways both distinguishable from this case and supporting of the ruling there was probable cause here. In **Johnson**, officers entered an apartment in response to a 911 call about shots having been fired and discovered in plain view evidence of a drug trafficking operation. Johnson was on the premises as a guest and was detained and searched, during which two cell phones were recovered. Four months after that search, police obtained a search warrant for the phones. Notably, other than Johnson's presence in the apartment with at least five other persons and drugs, there was no evidence linking him to drug trafficking from the apartment. "[W]here law enforcement seeks to search a person's cell phone based on the person's mere proximity to illegal contraband, some link sufficient to connect the two must be provided." **Johnson**, 240 A.3d at 587 (Opinion Announcing Judgment of Court). Other than the discovery of Johnson in the apartment in possession of cell phones, there was no information showing he had knowledge of the drugs or guns found in the apartment or any relationship to it or the person who leased it. Nor did the warrant even link the drug crime discovered in the apartment to

---

[8] In **Johnson**, the Supreme Court had intended to address the permissible scope of a warrant for a cellphone – Appellant did not raise such a claim – but instead addressed the lack of probable cause to permit **any** search of the cell phone. 240 A.3d at 696 (Opinion Announcing Judgment of Court).

- 18 -

the use of cell phones. *Id*. at 588. It was for those "particular facts" and lack of a nexus, that the Court "ascribe[d] no value … to the affiant's specialized knowledge that drug traffickers often use cell phones to conduct their business." *Id.* In contrast, there is ample evidence linking Appellant to the robbery and shooting that he committed with an unknown man, and so the specialized knowledge of the affiant that information on Appellant's cellphone would assist in identifying the other conspirator established the necessary link.

In Appellant's third claim of suppression court error, he argues that Mr. Peter's identification of him within minutes of having been shot by him was impermissibly suggestive because Appellant was in handcuffs and surrounded by "copious amounts of" police officers. Appellant's Brief, 28. The suppression court ruled that "[t]here was nothing wrong with the identification to warrant suppression." Suppression Court Findings of Fact and Conclusions of Law, 7. We agree with the suppression court.

Generally, a crime victim's identification of the defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both "impermissibly suggestive" and unreliable. *Manson v. Brathwaite*, 432 U.S. 989, 108-114 (1977); *Commonwealth v. Baker*, 614 A.2d 663, 668 (Pa. 1992). Appellant argues that because the victim was not likely to die from the wound "there was absolutely no need to rush the opportunity for Mr. Peters to make an identification." Appellant's Brief, 31. To the contrary, it was the most reasonable and efficient means of pursuing the

investigation, as it would have expedited both Appellant's release and the continuation of the search if the identification had been negative.

> The purpose of a "one on one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. ***Commonwealth v. Bullock***, […] 393 A.2d 921 (Pa. Super. 1978). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." [***Interest of***] ***McElrath***, 592 A.2d [740,] 742 [(Pa. Super. 1991)]. As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: "the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." ***McElrath***, 592 A.2d at 743 (citation omitted). The corrupting effect of the suggestive identification, if any, must be weighed against these factors. ***Commonwealth v. Sample***, […] 468 A.2d 799 (Pa. Super. 1983). Absent some special element of unfairness, a prompt "one on one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification. ***Commonwealth v. Brown***, […] 611 A.2d 1318 (Pa. Super. 1992).

***Commonwealth v. Moye***, 836 A.2d 973, 976 (Pa. Super. 2003). ***Accord Commonwealth v. Wade***, 33 A.3d 108, 114 (Pa. Super. 2011).

As the suppression court found, Appellant was apprehended shortly after the incident. He was brought to the ambulance, which was still on the scene, where Mr. Peters was being treated for the gunshot wound. Mr. Peters was conscious, aware, and able to articulate what happened. There was no obstruction to block his view of Appellant. He was asked by an officer, "was this the man in your apartment?" There was no hesitation on the victim's part to affirmatively identify Appellant by nodding his head. Suppression Court

- 20 -

Findings of Fact and Conclusions of Law, 7. An "on-scene, one-on-one identification[], even where an appellant is handcuffed and officers ask a victim to identify him as the perpetrator, [is] 'not so suggestive as to give rise to an irreparable likelihood of misidentification.'" ***Commonwealth v. Armstrong***, 74 A.3d 228, 239 (Pa. Super. 2013), ***aff'd on other grounds***, 107 A.3d 735 (Pa. 2014) (*per curiam*). We therefore affirm the suppression court's determination that the identification was reliable.

Appellant's additional argument that he was "surrounded by copious amounts of uniformed and armed police officers" at the time of the identification is not supported in the record.[9] The testimony was that there were "copious" numbers of responding patrol cars at the scene. N.T. 1/8/20, 69, 72-73. There were both police officers in uniform and EMTs at the ambulance when Mr. Peters positively identified Appellant, but no testimony as to the number of officers, much less that there were "copious" numbers of officers surrounding him. ***Id***., 78-79.

Appellant's final suppression claim is that the court erroneously admitted the transcript of Mr. Peters' preliminary hearing testimony. He specifically argues, as he did at the suppression hearing, that he had not had an opportunity for a full cross-examination at the preliminary hearing.

---

[9] The record of the suppression hearing must be viewed in the light most favorable to the Commonwealth as the motion winner. ***See Commonwealth v. Carter***, 779 A.2d 591, 593-594 (Pa. Super. 2001); ***Commonwealth v. Rickabaugh***, 706 A.2d 826, 832 (Pa. Super. 1997).

Appellant's Brief, 37-38. The Commonwealth argues, and the trial court held, that Appellant had stipulated to the preliminary hearing testimony and thereby waived the issue for appeal. Trial Court Opinion, 12; Appellee's Brief, 29. Appellant contends he did not stipulate to the admission of the transcript but only that the suppression hearing could continue over his objection to the transcript. Appellant's Brief, 36. We conclude that this issue is moot.

The preliminary hearing transcript was proffered by the Commonwealth for the limited purpose of rebutting a claim that the preliminary hearing testimony by Mr. Peters identifying Appellant was tainted by a newspaper article about the incident. N.T. 1/8/20, 87-88. Appellant objected to its admission. *Id*., 88. When the Commonwealth asked to call an officer who had been present at the preliminary hearing to testify to what he heard, Appellant again objected, but the court was more inclined to let the officer testify. To forestall the live testimony from the officer, Appellant agreed to allow the court to read the transcript, but over his objection. *Id.*, 90.

It is irrelevant to the disposition of this appeal whether Appellant's concession amounted to waiver, or if the admission of the transcript was erroneous. Use of the transcript was limited to whether Mr. Peters' testimony at the preliminary hearing had been tainted. The suppression court ruled that it had not been tainted, because the testimony made clear that Mr. Peters identified Appellant by sight and only learned of his full name from the newspaper article. Suppression Court Findings of Fact and Conclusions of Law, 7. Appellant does not raise that taint claim in this appeal. Therefore, he would

not be entitled to any relief, even if we resolved both the waiver and substantive issues in his favor. "A moot case presents questions and facts upon which a decision will have no effect." ***Fitzpatrick v. Fitzpatrick***, 811 A.2d 1043, 1045 (Pa. Super. 2002). We decline to rule on a question rendered moot by Appellant's appellate litigation strategy. ***Id***. ("It is well settled that a case or controversy must be present at every stage of the judicial process").

Appellant also raises two sentencing claims in his Reply Brief. To avoid waiver, Appellant styles each as a challenge to the legality of the sentence imposed. Appellant's Reply Brief, 2-5.[10]  The first, however, is a sufficiency of the evidence claim and thus unreviewable in this appeal because it was not raised in the Rule 1925(b) Statement. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"). The second is a proper merger claim challenging the legality of the sentence imposed. It is reviewable now, but upon review is meritless.

---

[10] "When an appellant uses a reply brief to raise new issues or remedy deficient discussions in an initial brief, the appellate court may suppress the non-complying portions." ***Commonwealth v. Gillins***, 302 A.3d 154, 162 n.6 (Pa. Super. 2023) (internal citations omitted) (quoting ***Commonwealth v. Fahy***, 737 A.2d 214, 219 (Pa. 1999)); ***see also Commonwealth v. Otero***, 860 A.2d 1052, 1054 (Pa. Super. 2004) ("Issues presented before this [C]ourt for the first time in a reply brief are waived"); Pa.R.A.P. 2113, note (a reply "brief may only address matters raised by appellee and not previously addressed in appellant's brief").

The trial court imposed an aggregate term of 153 to 306 months' incarceration with a concurrent term of 162 months' probation. The court structured the sentence so that the terms of imprisonment for aggravated assault would be served consecutively to each other, and the terms of imprisonment for criminal conspiracy would be consecutive to each other but concurrent with the aggravated assault terms.[11]

Appellant first argues that his conspiracy convictions must merge for sentencing purposes, because the evidence did not support conviction of multiple conspiracies but only one conspiracy with multiple criminal objectives. He relies on *Commonwealth v. Barnes*, 871 A.2d 812 (Pa. Super. 2005), *aff'd* 924 A.2d 1202 (Pa. 2007), which stated that to be convicted of multiple "counts of conspiracy, there must be separate agreements, or separate conspiratorial relationships, to support each conviction." *Id*. at 820. *Barnes* further states that:

> The factors most commonly considered in a totality of the circumstances analysis of the single vs. multiple conspiracies issue ... are: the number of overt acts in common; the overlap of

---

[11] Specifically, the court imposed the following terms: Count 2, 120 to 240 months for aggravated assault - F1, causing or attempting to cause serious bodily injury; Count 3, 33 to 66 months for aggravated assault – F2, causing bodily injury with a deadly weapon, to be served consecutively to Count 2; Count 31, 120 to 240 months for conspiracy to commit F1 aggravated assault to be served concurrently with Count 2; Count 32, 33 to 66 months for conspiracy to commit F2 aggravated assault, to be served concurrently with Count 3; Count 35, 120 to 240 months for conspiracy to commit F1 robbery, to be served concurrently with Counts 2 and 31; Count 36, 42 months of probation for conspiracy to commit F2 robbery, to be served consecutively to Count 35; and Count 49, 120 months of probation for conspiracy to commit burglary, to be served concurrently with Count 35.

personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

*Id*. (citations omitted). Appellant argues that the forcible entry, shooting and robbery "acts all occurred almost simultaneously in [Mr.] Peters' apartment, and involved the same method and objective, the forcible entry with a firearm to find and take items in the apartment." Appellant's Reply Brief, 3.

Whether multiple crimes were the product of separate conspiracies or a single conspiracy with multiple objectives under 18 Pa.C.S. § 903(c) is not a sentence merger claim but, rather, "implicates a factual assessment of either the conspiratorial agreement or the relationship of the conspirators." *Commonwealth v. Andrews*, 768 A.2d 309, 314 (Pa. 2001). It is therefore "a challenge to the sufficiency of the evidence." *Id*. "As such, the issue should be submitted to the jury in the first instance together with an appropriate instruction." *Id*. Appellant did not include this sufficiency challenge in his Rule 1925(b) Statement. Therefore, it is both waived, and improperly raised in a reply brief for the first time.

In *Andrews*, the Pennsylvania Supreme Court reviewed the issue because then-existing precedent "supported the manner in which Andrews raised the claim." *Id*. The *Andrews* decision pre-dates the start of trial in this case by 20 years and so Appellant was obligated to raise this claim as mandated in *Andrews*. Indeed, in *Barnes*, the case Appellant relies on,

Barnes had properly raised his challenge to multiple conspiracy convictions as a **sufficiency claim**. *See Barnes*, 871 A.2d at 819. Moreover, the logic of the assertion in *Barnes* that a bar to conviction for multiple conspiracies is the equivalent of an illegal sentence, *id*. at 821, is both *dicta* and unsupported. It is *dicta* because the relief granted was sufficiency relief. *Id*. at 823 (vacating convictions). It is unsupported because the case cited for that proposition states that "if no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction." *Commonwealth v. Randal*, 837 A.2d 1211, 1214 (Pa. Super. 2003). The unauthorized sentence in *Randal*, however, was a requirement that "a DUI offender install an approved ignition interlock system(s) on his or her motor vehicle(s)." *Id*. The statute that had permitted such a sentence had been ruled unconstitutional by the Pennsylvania Supreme Court. *Id*. at 1212-13. In other words, it was not a bar to conviction that made the sentence illegal, but the voiding of statutory authority for that **particular condition to be imposed** that rendered the sentence illegal. Accordingly, Appellant's first sentencing claim is not a challenge to the legality of the sentence imposed, and therefore was waived for review.[12]

___

[12] A challenge to an "underlying conviction at trial, not the sentence the trial court imposed … later" must be preserved with a "contemporaneous objection to the court's verdict [and] cannot be excused by resort to an 'illegal sentence' doctrine." *Commonwealth v. Spruill*, 80 A.3d 453, 461 (Pa. 2013).

Appellant's final claim is one of statutory merger of his two aggravated assault convictions. This claim is reviewable despite not having been raised in the Rule 1925(b) Statement or prior to the reply brief. **Commonwealth v. Williams**, 980 A.2d 667, 672 (Pa. Super. 2009).

The controlling merger statute provides:

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

The statutory provisions at issue are: 18 Pa.C.S. § 2702(a)(1) (attempting to cause serious bodily injury to another, or causing such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life); and 18 Pa.C.S. § 2702(a)(4) (attempting to cause or intentionally or knowingly causing bodily injury to another with a deadly weapon). Appellant argues that his consecutive sentence terms for two separate counts of aggravated assault should have merged under the statute and the matter should be remanded for resentencing on only one count of aggravated assault. Appellant's aggravated assault convictions do not merge.

Sentencing merger is prohibited unless the following two-pronged test is satisfied: "1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory

elements of the other." ***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009); ***Commonwealth v. Rhoades***, 8 A.3d 912, 918 (Pa. Super. 2010); 42 Pa.C.S. § 9765. Appellant asserts there was only one criminal act: using a firearm to force oneself into an apartment. He does not provide argument in support of this. He also asserts that subsection (a)(4) requires the use of a deadly weapon while subsection (a)(1) does not, but fails to examine any other element of either subsection. He concludes that merger of the convictions is required and the matter remanded for resentencing on only one count of aggravated assault. Appellant's Reply Brief, 4-5. Appellant is mistaken. This Court has held that these two subsections of aggravated assault do not share identical statutory elements. ***Rhoades***, 8 A.3d at 918.

"[S]ubsection (4) requires that the assault be caused or attempted 'with a deadly weapon.' This element is not contained in subsection (1), which prohibits any attempt to cause or the causing of serious bodily injury but which does not limit itself to any particular mode of causing such an injury." ***Rhoades***, 8 A.3d at 918 (***quoting Commonwealth v. Ferrari***, 593 A.2d 846, 848-849 (Pa. Super. 1991)). Thus, Appellant's aggravated assault convictions do not merge for sentencing.[13]

_____

[13] For similar reason, we doubt, but do not hold that Appellant's convictions for aggravated assault were necessarily based on the same criminal act. As the Pennsylvania Supreme Court held: "in all criminal cases, the same facts may support multiple convictions and separate sentences for each conviction except in cases where the offenses are greater and lesser included offenses. 'The same facts' means any act or acts which the accused has performed and

*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/20/2024

---

any intent which the accused has manifested, regardless of whether these acts and intents are part of one criminal plan, scheme, transaction or encounter, or multiple criminal plans, schemes transactions or encounters." ***Commonwealth v. Anderson***, 650 A.2d 20, 22 (Pa. 1994). There is a plausible argument – which the Commonwealth did not have an opportunity to make due to the manner by which this claim was raised – that the victim's two separate injuries, to his head and to his shoulder, were caused by different criminal acts during a single criminal incident. That is, Appellant pistol-whipped Peters twice in the head, thereby causing bodily injury with a deadly weapon and completing the crime charged under subsection (a)(4). ***See Commonwealth v. Duffy***, 832 A.2d 1132, 1138 (Pa. Super. 2003) (stating "striking the victim with a gun, may be used to satisfy the force requirements of at least two crimes, kidnapping and aggravated assault"). Subsequent to the pistol-whipping, Appellant then shot Peters in the left shoulder thereby causing or attempting to cause serious bodily injury and completing the crime charged under subsection (a)(1).